MERCHANTS' LOUISVILLE INS. CO. (WATERS v.). See Case No. 17,266.

MERCHANTS' MUT. LIFE INS. CO. v. The RICHMOND. See Case No. 12,795.

MERCHANTS' NAT. BANK v. CHICAGO. See Case No. 14,374.

MERCHANTS' NAT. BANK v. JEFFERSON COUNTY. See Case No. 15,472.

---

## Case No. 9,445.

### MERCHANTS' NAT. BANK v. LITTLE ROCK.

[5 Dill. 299.] [1]

Circuit Court, E. D. Arkansas. 1878. [2]

MUNICIPAL CORPORATIONS—LIABILITY ON BONDS —ILLEGAL SCRIP—VALID DEBTS.

The city of Little Rock, in payment of valid debts against the city, issued bonds in the similitude of bank-bills, in violation of statutes of the state, one of which prohibited the making or receiving of such paper. Afterwards the city

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

[2] [Affirmed in 98 U. S. 308.]

called in and cancelled these illegal bonds, and issued in their place other bonds, which were unobjectionable in form: *Held,* that the city was liable on these latter bonds to holders thereof who had not participated in the issue of the illegal bonds, although they had notice of all the facts of the transaction.

At law.

Mr. McClure, for plaintiff.
Mr. Rose, for defendant.

Before DILLON, Circuit Judge, and CALDWELL, District Judge.

DILLON, Circuit Judge (orally). This action is brought to recover on certain bonds of the city, numbered from 1 to 156, issued in 1874, under the power conferred by section 3294, Gantt's Dig. There is also a common count, based upon the same cause of action; and then another claim for an account known as the "ledger" account, which is in the nature of an acknowledgment of the liability of the city under the ordinance of October 30th, 1874.

It seems that the city, being indebted, and wanting to borrow money to pay such indebtedness and defray the necessary current expenses of the city government, in January of 1867, by the action of its council, resolved to borrow the sum of $100,000, specifying that $50,000 was for the establishment of schools, and $50,000 for other purposes.

Mr. Wassell, who was a member of the city council, testifies that at the time of the consideration of the question of the form in which the city could issue her obligations, this form of issuing the obligations of the city was deemed the most expedient—that is, to issue her obligations for money in the form of bonds. They could not, he said, issue money; they could, and did, issue bonds; and that they were advised by the city attorney that they had the power to do so.

The bonds which were issued were issued in denominations of $1, $2, $5, $10, $20, $50, and $100. The bonds were engraved with vignette, on colored paper, and in form and appearance very nearly resembling the ordinary greenback or bank-bill. The bonds in this form, purporting to be Little Rock city bonds, running for periods of from one to ten years, amounted, in the aggregate, to $100,000.

Here is the form of the bond: "Ten years after date, the city of Little Rock will pay five dollars to bearer, with interest at the rate of eight per cent per annum at maturity. Little Rock, Arkansas, July 22d, 1867." (Signed by the recorder and by the mayor.)

These bonds were paid out by the city for various classes of ordinary indebtedness. A portion of this money was expended under the direction of the city. council—$3,500 to pay for the lot on which stands the present city hall, and $17,500 for the erection of the present city hall; $6,000 went to pay overdue coupons on bonds issued by the city.

under legislative authority, in aid of the Memphis and Little Rock Railroad Company; $4,000 to put up the Peabody school-house; $6,000 was appropriated and went to pay the interest on those Memphis bonds; $3,600 to grade Markham street; $2,000 for culverts, and $5,000 and $2,000 for improvement of Ferry street; $2,000 to purchase cemetery grounds; $3,600 for the fire department; $8,000 for improving and extending the public landings; $2,000 and $4,000 for school sites; and from $1,500 to $1,700 per month was paid out on audited claims against the city for police services, salaries of city officers, gas, etc. It was paid out to persons who were creditors of the city, for property sold to it, or for materials furnished or labor performed for it.

The evidence shows—and it is undisputed—that when claims were allowed against the city by the council, a warrant was drawn on the treasurer of the city in the usual form, and when the warrant was presented to the treasurer what were called "Little Rock City Bonds," on bank-note paper, were paid out by the city on those warrants—the warrant being taken up and this paper given out in exchange for it.

The city received it for taxes, in the payment of licenses and other dues, and it passed in and out of the city treasury frequently —if not generally put out again, it was re-issued to some extent.

The evidence further shows—and it is an undisputed fact—that this paper, for a long period, was a very considerable portion of the circulating medium of the city; it was taken in and paid out by the merchants, bankers, and others; and the Merchants' National Bank, of Little Rock, received a very large amount of it. Undoubtedly it is true that a considerable portion of the bonds or claims sued on were for money of this character, termed "city bonds" or "city money," which the plaintiffs had received in the course of their business as bankers. The present plaintiff was not connected original-ly with the issuing of this money by the city; it was not issued to advance any scheme of the plaintiff, nor for any consideration furnished by it, nor by its procurement; nor was the plaintiff in anywise connected with the inception of it.

Afterwards the city council passed an ordinance by which they invited the holders of this paper to bring it in for cancellation, agreeing to issue to them new obligations of the city for the amount of the principal of those city bonds and the accrued interest thereon. The evidence shows (it is undisputed) that under that authority the present holders surrendered to the city the sum of $31,000, including accrued interest of $354.-22. They were cancelled and destroyed by the city; and in lieu of the amount of them then due, the city issued a like amount of bonds, to-wit, the bonds in this suit. The plaintiffs also had some other paper, which

they surrendered in like manner, and which was cancelled by the city, which acknowledged its indebtedness for the amount by giving plaintiff credit therefor on its ledger; and this is what is known as the "ledger account." The plaintiff shows that the new bonds were given for the principal and interest of the overdue bonds on bank-note paper, and the amount credited on the ledger account is for like bonds, and for which new bonds were not issued.

The city of Little Rock defends against this action, and its main defence is: The emission of these bonds in this form—on bank-note paper—and for the purposes in view (as it appears on their face that they were issued and circulated as money), was in direct violation of the statutes of the state in that regard, and, therefore, that the bonds thus issued were illegal and void, and that the new bonds issued in lieu thereof were also illegal, void and without consideration, the issuing of the original bonds having been in violation of the statutory provision, and, therefore, not imposing any legal obligation against the city.

This defence makes it necessary to inquire into the legislation on this subject in this state. I will, however, state, in this connection, that the court finds that the issuing of city bonds on bank-note paper, engraved with vignettes, in the similitude of greenbacks or bank-bills, in the denominations of $1, $2, $5, $10, $20, $50, and $100 notes, in connection with the undisputed fact that they formed for a considerable period the local circulating medium of the city and community, in lieu of currency, establishes that such bonds were issued for the purpose of circulating as money, in violation of the statutes of the state in that regard. But it is quite another question, and one not necessary to be decided in this case, whether the statutes of the state in reference thereto, and the expositions thereof by the supreme court of the state, declare that the city would not be held responsible to the holders of such bonds issued in payment of legal claims duly passed upon. I think it is better to refer to the legislation upon this subject chronologically, rather than in the order in which it is embodied in Gantt's Digest (chapter 19, p. 256). It would appear from the acts, that the state of Arkansas has for a long time had a very pronounced and decisive policy against the issue, by persons or by private or public corporations, of paper designed to pass as a circulating medium; and no one can say but that, in the light of experience, it is a wise policy.

The first act of the legislature upon the subject appears in the Revised Statutes of Arkansas of 1838 (page 674). It is entitled "Private Notes." No title to this act is given, but the title may be seen in another act afterwards passed, which went into effect February 14th, 1838 (section 5 of the act entitled

"Change Tickets"; c. 24, p. 175, Rev. St.), and the title is in these words:

"Sec. 5. The act passed at this session of the general assembly, entitled 'An act to prevent the circulation of private notes in this state,' approved November 25th, 1837, shall take effect and be in force from and after the 1st day of March next."

This first act, entitled "Private Notes," was passed and approved November 25th, 1837, and went into effect on the 1st day of March, 1838; and it is an important consideration, in order to understand the legislative intention, that the act entitled "Change Tickets" was last passed, though first to go into effect.

The first act, in its 1st section, provides as follows: "No person or persons, unauthorized by law, shall intentionally create or put in circulation, as a circulating medium, any note, bill, bond, check, or ticket purporting that any money or bank-notes will be paid to the receiver, holder, or bearer, or that it will be received in payment of debts, or to be used as a currency or medium of trade in lieu of money."

The next section provides: "If any person or persons shall issue, put in circulation, sign, countersign, or endorse any such note, bill, bond, check, or ticket, he, she, or they so offending shall be indicted, and, being thereof convicted, shall be fined not less than $50 nor more than $300, and be imprisoned not exceeding twelve months."

Section 3 it is important to consider: "If any person or company vend, pass, receive, or offer in payment any such note, bill, bond, check, or ticket, he, she, or they so offending shall forfeit the sum of $50, to be recovered by action of debt, with costs, to the use of any person who will sue for the same before any justice of the peace of the county in which the party offending may be found.

Section 4: "The preceding section shall not affect any note issued by any bank authorized by law in the United States, except notes for less sums than $5."

Approved November 25th, 1837; in force March 1st, 1838.

Now, it will be observed that corporations, private or public, are not mentioned in this act. By the 1st section, the terms of prohibition are that no person or persons, unauthorized by law, shall issue or put in circulation this unauthorized currency. By section 21 of chapter 129 of the same Revised Statutes, it is provided that "when any subject matter, party, or person is described or referred to by words importing the singular number or the masculine gender, several matters and persons, and females as well as males, and bodies corporate as well as individuals, shall be deemed to be included;" and by section 24 of the same chapter it was further provided that, "for the purpose of construction, the Revised Statutes passed at the present session of the general assembly shall be deemed to have been passed on the same day, notwithstanding they may have been passed at different times.

If any provisions of different statutes are repugnant to each other, that which shall have been last passed shall prevail, and so much of any prior provision as may be inconsistent with such last provision shall be deemed repealed thereby."

In a case some years after, the question arose in the supreme court of the state as to whether the word person, as used in the act approved November 25th, 1837, included corporations and municipal corporations; and the supreme court, in the case of Van Horne v. State, 5 Ark. 349, held that the word "person" did include corporations, public and private. If that is so, then we must hold this statute to read the same as though corporations had been expressly mentioned, for by construction the supreme court has incorporated the word "corporations" into the original statute; and when section 3 is read in the light of this construction, it provides not only if any person or persons, but also if any corporation or corporations, pass, receive, or offer in payment any of this illegal money, they are liable to a penalty, to be recovered by any person suing for it. And if this statute were without any modification, we have an interpretation by the supreme court of the state that corporations of all kinds, as well as private persons, are alike prohibited and liable to penalties; and not only to that effect, but the person who receives the money, or offers it in payment, is also made criminally subject to a penalty; so, while this statute provides against any person who shall put out a dangerous medium of circulation, if the law was still unmodified there would be some ground to claim, if it should be violated (and, unfortunately, all laws are violated), that the person who received and the person who attempted to offer it in payment were in pari delicto, for it is made criminal against him to issue it, it is equally made penal against you to receive it, and it is, therefore, equally in violation of the general purpose of the law, and there would be no right to recover under this act as it originally stood.

But before the session of the legislature closed, they passed another act (the act approved February 14th, 1838), which, in terms, refers to the subject matter of the previous act, and modified it by discriminating in favor of the person who holds the money in plain violation of the provisions of the law. [Rev. St. 1838, p. 175.] It reads (section 1): "The holder or owner of any change ticket, bill, or small note, issued for the purpose of change or otherwise, shall have the right to sue the drawer, issuer, or endorser of such change ticket, bill or bills, or small note or notes, before any justice of the peace in this state;" allowing him to recover the money, contrary to the prohibition of the prior act. We must conclude that subsequent consideration convinced the legislature that it was better not to punish the innocent receiver. Now, there can be no doubt, upon the original statutes, that the supreme court of the state, in

Van Horne v. State, was correct; nor is there any doubt that there is any less principle involved in holding municipal corporations issuing this scrip, equally with individuals, liable to the innocent party not procuring it to be issued.

There is another act in support of the view I have just stated—the act of December 17th, 1838 [Laws 1838, p. 13], entitled "An act to prohibit the issuing of small bills, notes, or change tickets." The 1st section provides: "That from and after the passage of this act, it shall not be lawful for any city, town, or corporation whatever, within the state of Arkansas, to issue small bills or notes, commonly denominated change tickets or shin-plasters, unless specially authorized by law."

Section 2 provides: "That all persons, officers of such city, town, or corporation, or others, whose names shall be affixed to any such bills, notes, change tickets, or shin-plasters, issued in violation of this act, shall be individually responsible for the same."

This act extends the liability to all persons, officers of any corporation or town, or others, whose names shall be affixed. Private corporations would be liable; and if any of its officers put his name to such bills or change tickets, it imposes a personal liability on him.

Section 3 provides: "That the holders of any such bill, note, or change ticket, or shin-plaster, issued in violation of this act, may sue for and recover in gold or silver the amount for which they purport to be payable, from the individuals whose names shall be affixed thereto, before any justice of the peace."

This act did two things: At the time it was passed, the Van Horne Case, in which the supreme court of the state held that municipal corporations were included in the first act, had not been decided, and this act removed any doubt as to whether municipal corporations, with others, were embraced within the inhibitions of the original act; and, secondly, it gave an additional remedy against the officers of the municipal corporation, making them also personally liable to the holder; but it did not take away any former or remedy given to the holder by the former act. Since the legislature chose to pass this special act relating to municipal corporations, it may be said the supreme court erred in deciding that corporations were included in the original act. But as between the legislature and the supreme court, the latter is the proper and the best interpreter of the meaning of previous acts of the legislature; and, besides, this last act had been passed and in force three or four years before the case of Van Horne v. State was decided.

Subsequently, in the case of Jones v. City of Little Rock, 25 Ark. 301, the court decided that the parties seeking relief were not the proper parties to apply for it, and, in delivering the opinion of the court, it was held that there was no right to issue this paper, and in the course of the opinion it is said that if it was issued contrary to law the city would not be liable for it.

The latter statement was clearly dictum, and it is claimed that so much of the opinion in Van Horne v. State as holds the city is liable for such issues is dictum also. If this is so, one dictum neutralizes or equals the other.

I cannot say that these decisions are conclusive in settling this statute, but it is clear to my mind that, although this paper was issued in violation of law, the legislature did not intend that the innocent holders of such paper should be held liable to the penalties imposed on those who receive it by the terms of the first act.

Upon the principles of law applicable to the subject, we are of opinion:

1. That the form and appearance of the city bonds, on bank-note paper, engraved with vignettes, in the similitude of greenbacks or bank-bills, and of the denominations of $1, $2, $5, $10, $20, $50, and $100, in connection with the undisputed fact that they did form, for a considerable period, a local circulating medium, and were used by the city and the community in lieu of currency, establishes that the said bonds were issued for the purpose of circulating as money, and in violation of the statutes of the state in that regard.

2. It is quite another question, and one not necessary to be decided in this case, and which we do not decide, whether, under the statutes last referred to, in view of the exposition thereof by the supreme court of the state, the holder of such bonds, if in nowise concerned in their illegal issue, and if they represented or were issued for a valid and legal claim against the city, could not recover thereon against the city. Nor is it necessary to determine whether the act of December 14th, 1875, has the effect to validate city money, so called, of the character of the bonds issued by the defendant city, known as city bonds, on bank-note paper.

3. The immediate consideration of the bonds in suit was the surrender by the plaintiff to the defendant of an equal amount, including interest, of what are styled "city bonds on bank-note paper," all of which last-named bonds were overdue at the time of such surrender, and of date prior to July 13th, 1868, and which were held and owned by the plaintiff at the time of such surrender, and which had been originally issued to other persons than the plaintiff, in exchange for or payment of the ordinary warrants of the city—issued to divers persons upon valid claims against the city, audited and allowed by the city council. The city bonds on bank-note paper thus held by the plaintiff were, at the instance of the city, surrendered to it, and destroyed by it, and the bonds in suit issued therefor. Assuming, but not deciding, that if in the hands of the plaintiff the said city bonds on bank-note paper could not have been enforced in an action directly on said bonds against the city, the court is of opinion that the bonds in suit, issued by the defendant in lieu of said

bonds on bank-note paper (the last-named bonds having been originally issued under the circumstances above stated, for valid debts against the city to other creditors of the city than the plaintiff, and the plaintiff not having been connected with their issue), constitute a valid ground of action against the city, and the city is liable thereon to the plaintiff, although the said city bonds on bank-note paper were of such an appearance, and of such a form, as to be especially adapted to constitute a circulating medium, and were in fact used in and about the city as a local circulating medium in lieu of money.

4. There is also a claim against the city for the amount of certain city bonds, on bank-note paper, surrendered by the plaintiff to the city at its request, for which the city issued no new bonds, but placed the amount of the bonds surrendered by the plaintiff and destroyed by the city to the credit of the plaintiff on the ledger of the city. The same principles of law apply to this claim as to the claim on the new bonds.

5. Under the foregoing views there is no question of the statute of limitation in this case, although it is probable that, under the "call" made by the city in 1875, and the action taken thereunder, this defence would in no event be available to the city; but it is not necessary to rule the point.

The plaintiffs are entitled to judgment for the amount of the new bonds issued in lieu of the bonds surrendered, and the amount placed as the credit to the plaintiff on the ledger account of the city, which was introduced in evidence.

Judgment accordingly.

This judgment was affirmed in the supreme court. 98 U. S. 308. See subsequent opinion of state supreme court [unreported].